May it please the Court, my name is Paul Pfeiffer, I'm here on behalf of Pizza Pro Equipment Leasing. I am here to argue the brief that was written and argued below by Mr. Perrone, unfortunately he was not able to be here because of medical disability and so I'm here to argue and the first thing that I think that we need to understand when we're dealing with this issue and it's the funding of a defined benefit plan. This case involves a plan that was approved by the IRS starting in 1995. It had been amended on several occasions and every amendment was also approved. It had one participant which was the president of the company. I think that's important to understand this isn't a large plan, didn't have more than one participant. The thing that this case is dealing with is the plan provided a benefit for somebody or for the benefit of an early retirement of 45 years old and under the statute, the statute says if you have a benefit that starts at 45 and at this time at least, I know the statute's been amended several times, but at the time and issue you reduce it and make it equivalent to a benefit that was payable or that's paid at the age of 62. The benefit under the statute is limited, at that time it was limited between 160,000 at the first year up to I believe 175,000 in the last year. Now a defined benefit plan generally is the plan will pay this amount of money, whether it's $160,000 from age 62 until the time that you die. This plan, the benefits did not cease at death, they were paid out. Many benefit plans, large plans mainly, there is a when you die your benefits go away and so the use of a mortality decrement is absolutely necessary, otherwise the plan will be overfunded because we all know, the government points out, I think we all agree that not everybody is going to live forever and not everybody's even going to live to the age that the plan calls for. It wasn't going to pay out forever, was it? Absolutely not. Yeah, so when the second person's spouse or something's lifetime? Yeah, it'll just get paid to the beneficiary. So at that point in time when somebody dies, they're fully vested, so we're not dealing with the issue of whether this person's vested or not, he's fully vested at all times and it gets paid out upon his death. There's no forfeiture. Statute says equivalent and the regulation adds actuarial equivalent. The regulation says actuarial equivalent, but it doesn't necessarily define that. Is there any challenge, I didn't see a specific challenge in Mr. Perroni's brief saying that that regulation was an improper interpretation of the statute. No, he did not, but we have paper, it reminds me of when I was a child and Ronald Reagan put the IRS code and we're here today, there's hundreds and hundreds and hundreds of regulations that argue with what is equivalent mean or what actuarially equivalent means and I don't think that's necessary. I think that if you step back and try to figure out what's this plan supposed to accomplish, it was approved plan. In fact, it had been previously audited and with no findings of problems. The other plans, in fact, Mr. Perroni's plan was audited for the exact same issue and the government didn't find any problems with it either. So I think if you step back and try to figure out, try to understand what this plan is supposed to do, it makes sense. Well, I'm not an accountant and I've struggled with understanding this, but maybe in my overly simplistic view of it, it seems to me that you are actually told what life expectancy tables to use, you're told what discount rate to use, which is 5%, right? It would seem to me that if an actuary could say at age 62 to purchase an annuity with a 5% discount rate that would last a person's lifetime, which is what they did to pay a benefit of $160,000 the first year. Putting aside, those numbers went up a little bit. That same actuary could say, okay, now this plan provides you get $160,000 at age 45. It will last both his lifetime and his spouse's lifetime, and in the event that they die before it's all paid out, they get part of the money back. An actuary could figure out, using a 5% discount rate, what that number is, could they not? Well, that's what the plan did. It just reduced the amount by 5%, and the expert that was hired by the plan, in this case, produced numbers that showed what is the present value of the benefit that the plan agreed to pay at 45 versus what's the present value of what the plan was supposed to pay if you less than what was allowed under the statute. And it was done that way, I think, strategically by Mr. Perroni for exactly the reason that you just pointed out. It's very simple. You reduce the present value, and the... But my understanding is that the response from the government is it's not really that simple. That you're sort of assuming a fixed, static time period based just on life expectancy, rather than looking on a year-by-year basis, what are the odds that this person is going to pass away? You know, a person who's 85 is more likely to pass away in a given year than a person who's 45, right? Yep. But the statute says that if the benefits do not get forfeited, you don't use a decrement. Well, they say they're not using a decrement. I know what they say, but when you look at it, and their expert report even says that when you're dealing with annuity purchase rates, that you automatically assume a death decrement. I mean, he doesn't use that term. He tries to distinguish it, but it's the same thing. It's a decrease based on somebody's death. It's important to have that in plans, by the way. We're not saying that you can't always do it that way, but in this plan where there's one person and it's not forfeited, it's not necessary. The plan and the regulations say that you do not decrease it based on a death decrement. The reason why, if you have a plan of the three of you all, you're not all going to die at the same age, and so there is an actuarial analysis that does. And if you die and your benefits get forfeited to the plan, which happens in a lot of plans, then the plan will automatically be overfunded because not everybody's going to die at the age that the mortality table says that they're going to die. We agree with that, and this plan did use a mortality table to come up with the benefits. So it said, and I'm not an actuarial, but there are actuarial reports in the record where they establish if you pay $165,000 a year or $160,000, depending on the year, and you live to this certain amount, what is it going to? It reduced it back to an amount that needed to be paid in to accomplish that because what you don't want in a plan is to have it underfunded. The plan would be in trouble if the plan was underfunded. And this court's probably heard plenty of cases where plans are underfunded and plan administrators and actuaries may get sued for not doing what they're supposed to do. So you're correct. The statute says what the statute says. It reminds me of what I tell my kids. I have an eight-year-old and a four-year-old. You mean what you say, and you say what you mean. The statute says that the benefit has to be equivalent at 45 to the benefit that you would take if you're 62. And that's what the Pizza Pro did in this case. Now... And, again, as simply as possible, how do you think you compute that? When you've got a benefit at 62 that says $160,000 life only, at 45 you've got a benefit that says $160,000 life plus spousal's life, plus if you die early, you get all the money back. What the plan did was reduce it by the 5%, which is what it's called for in the statute. The plan reduced it the exact same way as the continuing education materials that is in the record that the IRS gave to its own agents to figure out how to do this with the plan. If you read there, there, and that's at the appendix 425 through 427, that's exactly the way that Pizza Pro did it in this case. You can get an actuary... There's a lot of actuarial jokes out there, and you have a lawyer, you have an accountant, and you have an actuary. If you ask what 2 plus 2 is, the CPA's going to say 4. The lawyer's going to say, well, it seems to be 4, but I may need to go review the rules of mathematics. The actuary will say, well, what do you want the answer to be? And that's not what we did here. It's a very simple process, and it doesn't need to have an expert issue a 25-page report trying to argue that you do this analysis and then you take a ratio. All you need to do is do it to present value, reduce it to the amount, and then what the Pizza Pro did in this case was hire a mathematician to explain that if you look at these two benefits at present value... Not an actuary, though. At present values, they are... In fact, the plan is less than the present... The 45, what was paid out, if it gets paid out at 45, is less than the present value of the full amount that would have been paid out at 62. What's our standard of review on what method was used? It's a question of law. So it's de novo. You either decide, was the statute clear when it said equal, or was the statute not clear or clear as far as what the government... Don't challenge the regulation. The regulation says actuarial equivalent. That's right. They brought in an actuary who used a method that's different than the method your person used. You think that's a legal question rather than a fact question? Yeah, because the method... I think the method is... The method, it has to be... You have to show deference to the plan, and the tax court shows no deference to the plan. It just said that you didn't have an actuary, so I'm not going to, in essence, take what your mathematician said. But their own materials... I mean, it really wasn't that simple. I mean, it's the element that's missing. It's not just that they didn't use an actuary. It's that there is an element missing from the computation. Isn't that correct? That is correct. And the element that this government... This mortality decrement that's bandied around. That's right. And I'd like to save some time for rebuttal, unless you have... Very well. Thank you. Thank you. Thank you. All right, Ms. Bringer. I think I understand what method he's suggesting should be used. Can you maybe explain why the actuary's method is better? Yes, Your Honor. Or different? I can try. Like, I think, all of you, I am also not an actuary. So, for me to get into this case has also been an exercise. So, Mr. Klubach, the commissioner's expert, you know, 40 years of expertise in doing these particular calculations, talked about how actuaries do this. And, you know, as we've been talking about, that is the question. What is actuarial equivalence, as the regulation requires? And he explained this three-step process. And I'm going to try to put it in sort of more of a layperson's language, how I've been thinking about it. So, the statute and the regulation together tell us that a defined benefit plan that pays early, like this one does, has to be equivalent to the actuarial equivalence, to $160,000 per year, starting at age 62. So, the first question is, well, what is $160,000 starting at age 62 worth? And Mr. Klubach tells us that, and told the tax court, that actuaries figure that out by determining how much it would cost to buy an annuity starting at age 62 that pays $160,000 per year. And he explained that actuaries do that by multiplying the benefit times an annuity purchase rate, this APR. And the APR is a combination of two things. It's a mortality table, not a mortality decrement, as we discussed in our brief. Those are two different concepts in actuarial science. So, it's a mortality table, and it's the table that's prescribed by the secretary, as Congress required, plus an interest rate. So, you take the benefit times the APR and get a lump sum. Now, that is a mathematical computation. Absolutely. Yes. Is there any dispute about that number, the starting number? Well, I believe there is a dispute because PizzerPro claims that the use of a mortality table is instead a mortality decrement. Now, if I may just talk about that for a moment. The concept of the mortality decrement and whether or not it should be used in the years at issue here comes from IRS guidance. There's a couple of notices in an IRS revenue ruling that talk about what should be used in making these calculations. And that administrative guidance says you generally or usually must use a mortality table, but under the circumstances present here, where the benefits are not forfeit at death, you don't use a mortality decrement. So, that alone makes clear that these are two different concepts. So, step one of this calculation, to get back to that question, is this question of how much does it cost to buy that annuity at age 62? You get a lump sum. Then discount that lump sum for 5% interest per year over 17 years, that difference between 45 and 62. Then we have a new lump sum, this discounted lump sum. And the question at that point is, well, how much of an annuity can I buy for a 45-year-old with this lump sum? So, it's the opposite of the first step. The first step, you start with a benefit, you get a lump sum, you discount it at the second step. At the third step, you have this discounted lump sum and have to figure out how much of an annuity you can buy with that. And again, actuaries use an APR, this combination of the mortality table and an interest rate to figure out how much of an annual benefit one could buy with that discounted lump sum. Isn't that maybe the crux of the dispute here? Is when you use the mortality, the APR, so to speak, going to unwind the lump sum number, that since this one is life of him, life of spouse, and then they get whatever's left, I guess the estate gets whatever's left, that that's where it shouldn't have been used? Isn't that the crux of the argument here? So, I'll say something about that, Your Honor, because I think that is a confusing point with respect to these qualified joint and survivor annuities, which I think is what you're talking about. This plan, like many defined benefit plans, does have that survivor annuity provided for. But in section, I believe it's section 417 of the Internal Revenue Code, which I believe we talked about in our brief, the Congress provided that where that benefit is included in the plan, this qualified joint and survivor annuity, that the value of that also has to be the actuarial equivalence of a straight life annuity for the plan participant. So, this is why I've come across this in my personal life very often where there's a qualified joint and survivor annuity that's elected. And the pension paid to the plan participant is often less than it would be if they did not elect the qualified joint and survivor annuity. And the reason for that is because that extra benefit that may be paid to the spouse or other beneficiary has to be the actuarial equivalence of just a straight life annuity on the participant. Does that help? Yeah, I mean, I think I understand that. But in this case, isn't there also a kicker at the end that when they both die, the remaining money goes to their estate? Well, Your Honor, that issue would again require more actuarial calculations. And it's not something that the parties really talked about in the tax court. And so that particular piece was not before the tax court. But 415B2B, which we mentioned in a footnote, says that where there's some part of this plan that is not a single life annuity for the participant, that whatever the plan provides has to be the actuarial equivalence of this single life annuity for the plan participant. So sometimes plans might provide, I don't know, property or stocks or all kinds of things at retirement, and whatever the plan provides has to be that actuarial equivalence. Maybe go back to where you were before I interrupted you. Sure. You had the lump sum, and then what happens? So we were talking about the discounted lump sum at Step 3? Right. So then the question is, from an actuary's point of view, how much of an annuity can I buy for a 45-year-old with that discounted lump sum? And so what Mr. Klubach did here, and what he tells us is the standard for actuaries, is he used this annuity purchase rate and figured out how much of an annual benefit can one buy for a 45-year-old with that lump sum of money. How did he factor in, did he use a straight life annuity analysis? That's one of the things I couldn't quite understand. Did he use straight life, or did he factor in this survivorship benefit? Because as you said, if there's a survivorship benefit, it's a lower annuity than if it's a straight life annuity. Right. So the only issue really that the parties talked about and that the tax court talked about is this maximum annual benefit under Section 415. And so when Mr. Klubach did the calculations, he was looking at that maximum annual benefit question. And in doing his calculations, the mortality table he used is the one specified by the secretary for a single life annuity. And that is exactly what Congress expected people to do. In Section 415b2e5, Congress said the mortality table to be used in doing these calculations must be the one prescribed by the secretary. So we know from that that Congress expected people to use a mortality table in making these calculations. Okay, so once you get that number, then how do you decide what the taxable or non-taxable amount subject to the excise taxes? Sure. So it might be helpful just to briefly walk through how these statutes intersect with each other because there is some movement around in the Internal Revenue Code. So the excise taxes imposed here are imposed under Section 4972. And that section imposes these excise taxes for excess deductions for contributions. So the question is, how does one know whether or not there's an excess deduction? Section 404 deals with that question. It deals with the deductibility of contributions to defined benefit plans. And in one of the subsections of 404j1a, Congress required that annual contributions may not be based on a maximum annual benefit that exceeds the 415 limits. So that's how we all get to 415, which of course has been the focus of the party's arguments as well as the tax court's efforts here. For this plan in this period, the maximum deduction the plan could take was the same as the minimum required contribution. So the point of a defined benefit plan is to fund the plan over time so that when it comes to the time to pay out the benefits, the plan will be fully funded. So there's this calculation of how much should be contributed per year, this minimum annual contribution. And that involves a number of things. It involves how long it will be before the benefits are paid out. Are we talking 20 years in the future or three years in the future? The assets that are already in the plan, the value of those assets, what's expected to happen with those assets. And then of course the central question here, which is what's the pension that this plan needs to pay? And so that's how this maximum annual benefit plays into that calculation. It's a core piece of figuring out how much must be contributed per year for the plan to be funded by retirement. I think the question here really is a specific and narrow one, which is did the tax court clearly err in crediting the commissioner's expert rather than the report provided by Pizza Pro? And I think the question or the answer to that has to be no, the tax court did not clearly err. From the tax court's point of view, I'm not aware that this judge is an actuary either, so we're all in the same boat on that front. And in trying to determine actuarial equivalence as the regulation required, it was reasonable for him to look to the expertise in that field of actuarial science. And indeed the parties provided him with some reports about what that phrase means. I think the method used here is a fact question. You say clearly erred. So the regulation at this time required actuarial equivalence. And now, as we discussed in our brief, the regulation is more specific and lines up with what the commissioner's expert did here. But given that bare phrase, actuarial equivalence, I think the tax court had to look to an expert in the field of actuarial science. At that time was not a regulation or a statute that specified what that means. And in receiving information from the proffered experts and determining which expert to credit, and really I think as the tax court put it, which expert was most helpful, that is in the nature of a factual decision, which of these experts is more qualified or more helpful to the court and should be reviewed for clear error. I'd like to say one word, if I may, about this argument at the end of Pizza Pro's brief regarding the election under 4972C7 that they claim Pizza Pro made. Pizza Pro does not point to any affirmative step that it took at all to make an election under that provision. It's unclear what Pizza Pro claims was the election. What is that election? I mean, it sounds like it just magically makes this all go away if they would have done something to elect to this. That can't be right, right? So I have picked the brains of my colleagues at the IRS who live in this pension plan world about that very question. And I think for many taxpayers, the beneficial answer would be to make that election. There may be some taxpayers where, for very complicated reasons, that would not make sense for them. But I think for most taxpayers, it would make sense to make that election under 4972C7. Make this election, you don't have to do any of these calculations and this whole analysis goes out the window? No, no, Your Honor. So the 4972C7 allows for an election to not take into account contributions up to what is called the full funding limit of a plan. And the commissioner's expert determined that, in fact, the full funding limit had been exceeded by Pizza Pro. It's an issue that the tax court did not reach because the tax court determined that they did not make an election and didn't need to reach that question of the full funding limitation. But there still are limitations on what a company can contribute to the plan and all of these calculations still need to be done to determine that. I see that my time is almost up. Are there any other questions from the panel? Thank you very much. Your Honor, very briefly, when you're talking about mortality tables and the mortality decrement, I'm glad I'm not the only one that started reading this and my head was spinning a little bit. But I started and have ended at the same place. And what did the IRS tell their employees about how to deal with this? And if you look at the appendix on 423, which is their training materials, it says the mortality table does not apply if the participant's benefit is not forfeited upon death. You don't need to do what the government's expert did for 20 pages or so to try to figure this out in this plan. Some plans you have to do that. This plan you didn't because the benefits did not get forfeited upon death. The other training materials that the IRS also points out where it has the term, concept of actuarially equivalence, and that is on the appendix, page 425, and it very simply describes the math, the same math that Pizza Pro used in this case, which was to determine going back using the 5 percent. Some years it was 5.5, but basically the 5 percent going backwards. Thank you. Can I ask one quick question? And maybe I should have asked this to the IRS. As I understand it, this 10 percent excise tax is assessed on the excess amount that was deducted on the tax return. Is that correct? That's my understanding. And as I understand it, when the commissioner made a notice and said, you've deducted more than you're allowed, as I understand it, the taxpayer acquiesced in that, paid the tax and interest, but only fights the excise tax. So why isn't the number that they paid the tax and interest on the same number as you paid the excise tax on? Or am I totally missing the point here? Well, yeah. One thing that is clear, the numbers through this audit changed constantly, and it was very hard, honestly, for me to follow where those numbers went. Those were the IRS numbers, and it was like a moving target. I believe the answer to your question is, or one of the issues is, that Pizza Pro paid the income taxes years ago in a settlement, and I think they were hopeful this issue would just go away, and then all of a sudden years later they get this notice on excise tax, and I think that that answers that question. Thank you. Very well. It's a challenging case. We appreciate your briefing and argument. Thank you very much. I'm not sure we totally understand it, but the case will be submitted, and we'll do our best to figure it out and issue an opinion in due course.